# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

No. 98-40927

_____

TIMOTHY L. GRIBBLE,

Petitioner-Appellant,

VERSUS

GARY L. JOHNSON, Director, Texas
Department of Criminal Justice, Institutional Division,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
(98-CV-32)

_____

September 20, 1999

Before JONES, SMITH, and STEWART,
Circuit Judges.

PER CURIAM:[*]

Timothy Gribble requests a certificate of appealability ("COA") from this court, following the district court's denial of his request for a COA and of his petition for writ of habeas corpus, in regard to his conviction of capital murder and a resulting sentence of death. Finding no substantial showing of the denial of a constitutional right, we deny the request for a COA.

## I.

Gribble "gained entrance into [Elizabeth Jones's] home under false pretenses. He took her from her home, in nothing but her

bathrobe, to a secluded field where he strangled her and hid her remains." *Gribble v. State* (*"Gribble I"*), No. 71,485, slip op. at 2 (Tex. Crim. App. Feb. 1, 1995) (unpublished). During the investigation of Jones's disappearance, Gribble was questioned. He submitted to a polygraph examination by a private investigator, conducted at a police station on September 21 and 22, 1987. *See id.* at 10-11. He left Texas a few days later, *id.* at 11, and was arrested in Tennessee on an unrelated felony charge from Harris County, Texas, *id.* at 5.

Gribble voluntarily returned to Texas and confessed to the murder. He drew a map of the location where Jones's body and purse could be found. *Id.* Law enforcement officers tape recorded his confession. *See id.* at 8-9. Before he guided officers to these locations, he appeared before a state magistrate on or about October 4, 1987. *Id.* at 5-6. The magistrate informed him of his right to counsel, whereupon he indicated his desire to have counsel appointed after he led investigators to

_____

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

the body. *See id.* at 6.

## II.

In April 1992, a jury found Gribble guilty of capital murder in the course of kidnaping Jones on or about September 9, 1987. *See Gribble I*, slip op. at 1; *see also* TEX. PENAL CODE ANN. § 19.03 (West 1987). The jury answered in the affirmative the two special issues set forth in TEX. CODE CRIM. P. ANN. art. 37.071(b) (West 1987), and Gribble was sentenced to death. Previously, he had been found guilty of capital murder and sentenced to death, but that judgment was reversed, thus requiring retrial, because of *Penry* error, *see Penry v. Lynaugh*, 492 U.S. 302 (1989), in the jury instructions from the punishment phase. *See Gribble v. State*, 808 S.W.2d 65, 75-76 (Tex. Crim. App. 1990).

Gribble appealed his conviction and sentence from the retrial by raising eight issues, and the Court of Criminal Appeals affirmed. *See Gribble I*, slip op. at 1. Court-appointed counsel filed a state petition for habeas relief. Gribble, *pro se*, filed a motion to strike the habeas petition because it raised issues that had been rejected on direct appeal. Gribble viewed counsel's petition as inadequate, and he listed the following issues for postconviction consideration:

> (1) [T]he jury charge at the guilt phase relieved the prosecution of its obligation to prove every element of the crime beyond a reasonable doubt; (2) despite specific requests, the state failed to produce exculpatory evidence related to both guilt/innocence and punishment; [and] (3) the trial court committed reversal [sic] error by refusing to instruct the jury on mitigating evidence of applicant's background of childhood abuse.

The state trial court made proposed findings of fact and conclusions of law and denied habeas relief, essentially relying on the opinion from the direct appeal to conclude that no relief was warranted on the claims previously raised. The court considered the claims raised *pro se* and concluded that there was no support for any claim concerning habeas counsel's assistance, jury instructions, or the purported failure to produce exculpatory evidence.

The Court of Criminal Appeals agreed with the trial court's findings and conclusions concerning the claims raised by court-appointed counsel. The court assumed, without deciding, that the claims raised *pro se* were supplemental habeas claims and concluded that Gribble had failed to show entitlement to relief.

Gribble filed another *pro se* motion, requesting leave to file an out-of-time habeas petition, indicating that he intended to assert that habeas counsel had rendered ineffective assistance. The Court of Criminal Appeals treated the motion as a second habeas petition and dismissed it as an abuse of the writ. The state trial court set April 22, 1998, for execution of the sentence.

In January 1998, Gribble moved for the appointment of counsel to assist him in filing his federal habeas application. Appointed counsel filed a motion to stay execution and a habeas application that raised multiple issues. The court granted the stay of execution.

The state filed an amended answer and motion for summary judgment. Gribble requested a conference, pursuant to FED. R. CIV. P. 16(a), and indicated that he presumed that an order would be entered similar to an earlier order that had relieved him of the duty to file a response to the summary judgment motion as contemplated by local rule. The court denied the request for a conference.

Eight days after the state filed the summary judgment motion, the district court granted it, denied habeas relief on the merits, and lifted the stay of execution. *See Gribble v. Johnson*, 8 F. Supp. 2d 942, 942-57 (S.D. Tex. 1998). The court analyzed nine constitutional claims: four issues arising from Gribble's statements to police, from interrogations, and from confessions to the rape, kidnaping, and murder of Elizabeth Jones, *see id.*, 8 F. Supp. 2d at 948-52; a Sixth Amendment challenge to

the exclusion, for cause, of a jury venireman, *see id.* at 952-53; a contention concerning improper prosecutorial argument, *see id.* at 954-55; challenges to the sufficiency of the evidence proving the kidnaping, proving Gribble's intent to cause Jones's death, and proving the deliberateness of his acts, *see id.* at 955-56; and a due process challenge to the "nullification charge," the jury instruction used to correct the defect identified by *Penry*, *see id.* at 956-57. The court relied on a procedural bar for disposing of only one claim but noted that the state had raised a procedural bar on two other claims. *See id.* at 950, 954 n.13, 955. After entering final judgment, the court denied a request for a COA.

### III.

"A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is the same as for issuance of a certificate of probable cause. *Muñiz v. Johnson*, 114 F.3d 43, 44 (5th Cir. 1997), *cert. denied*, 523 U.S. 1113 (1998). Because Gribble's habeas application was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), that statute applies to his case. See *Williams v. Cain*, 125 F.3d 269, 274 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 144 (1998).

Under the AEDPA,

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claimSS

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254. A full and fair adjudication of the claims in state court is a prerequisite for application of AEDPA's review provisions. *Corwin v. Johnson*, 150 F.3d 467, 471 (5th Cir.), *cert. denied*, 119 S. Ct. 613 (1998).

Pure questions of law are reviewed under the "contrary to" standard; mixed questions of law and facts are reviewed under the "unreasonable application" standard. *Drinkard v. Johnson*, 97 F.3d 751, 767-68 (5th Cir. 1996).* The application of law to facts is "unreasonable" only when reasonable jurists considering the question would view the state court's ruling as incorrect. *Id.* at 768-69. Habeas relief is thus appropriate only where "a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." *Id.* at 769. "State court factual determinations shall be presumed correct unless rebutted by 'clear and convincing evidence.'" *Jackson v. Johnson*, 150 F.3d 520, 524 (5th Cir. 1998) (interpreting § 2254(e)(1)), *cert. denied*, 119 S. Ct. 1339 (1999).

IV.

Gribble argues that his statements given to private investigators and police on September 21, 1987, and without his being informed of his right to counsel or to remain silent, should have been suppressed and that the state appellate court erred in its conclusion

that he was not in custody when the statements were made. The Court of Criminal Appeals determined that Gribble was neither in custody nor under arrest, because he voluntarily appeared at the police station and voluntarily submitted to the polygraph examination. Therefore, the need for the prophylactic warnings of *Miranda v. Arizona*, 384 U.S. 436 (1966), were not necessary, and the exclusionary rule was inapplicable. *See Gribble I*, slip. op. at 9-13.

"*Miranda* set[s] forth rules of police procedure applicable to 'custodial interrogation.' 'By custodial interrogation, [the Court] mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977) (quoting *Miranda*, 384 U.S. at 444). The "in custody" determination is a mixed question of fact and law. *Thompson v. Keohane*, 516 U.S. 99, 102 (1995). Therefore, the § 2254(d)(1) standard applies.

At the suppression hearing conducted on April 26, 1988, Mary Wood, the private investigator who conducted the polygraph examination on September 21, 1987, testified that Gribble was waiting when she arrived at the police station; he had questions about polygraph tests, which she answered; he signed the test waiver form; she and he conversed quite a long time about Jones's disappearance; the test results revealed a problem response to two of the test questions; and Gribble signed two written statements after the test was conducted. Gribble's account of his activity with Jones given to the private investigators and police officers on September 21 was exculpatory. Wood's testimony indicated that Gribble's cooperation on September 21 was voluntary and that he could have left at any time. Her testimony at the second suppression hearing was consistent with her earlier testimony.

Officer Sergio Medina testified that Gribble agreed to come to the police station for the polygraph examination, although Gribble failed to appear for the first scheduled examination.

---

* To the extent that *Drinkard* and its progeny interpreting the provisions of AEDPA do not conflict with *Lindh v. Murphy*, 521 U.S. 320 (1997), they remain controlling precedent for this court. *Nobles*, 127 F.3d at 413 n.4; *see Green v. Johnson*, 116 F.3d 1115, 1119-20 (5th Cir. 1997).

Gribble became unsure of the polygraph examiner, and Medina reassured him about the polygraph procedures and told him that he could leave at any time. Gribble was advised of his rights after revealing to the officers, following the examination, that the truck he had been driving to work could have been a stolen vehicle.

Before he was warned, the officers had accompanied him to his residence, impounded the car, and returned to the police department. Gribble came back voluntarily to the office and cooperated with the investigation of the stolen truck.

Gribble testified at the first suppression hearing, and his testimony was admitted at the second suppression hearing. He testified that Medina pressured him into feeling guilty about not wanting to cooperate or to take the polygraph examination; Gribble did not mind answering the questions, but he did not want to answer with the monitoring of the polygraph machine; and his impression was that he had to take the test, or he could not leave.

The findings of fact underlying the Court of Criminal Appeals's determination that Gribble was not in custody are supported by the testimony at the suppression hearings, a portion of which has been summarized above. *See Gribble I*, slip op. at 10-12. Gribble focuses on the lack of warnings he received compared to the warnings given to another person the investigating officers interviewed on September 21. He contends that the different treatment supports the conclusion that the police had the subjective intent to obtain his signed statements without the benefit of warnings of constitutional rights.

Any difference in the treatment accorded the two persons interviewed on September 21 does not detract from the ample testimony revealing that a reasonable person in Gribble's situation would not have viewed himself as being under arrest, in detention, or significantly deprived of freedom of action.[**] The Court of Criminal Appeals's determination that Gribble was not in custody was not an unreasonable application of federal law. *See Drinkard*, 97 F.3d at 767-68; § 2254(d)(1); *Mathiason*, 429 U.S. at 494-96.

V.

Gribble presents two arguments under one issue: He avers that his comment, requesting the stop of the taping of his statement, or the momentary stop of the recording of his confession, given to investigating officers during the interrogation on October 3, 1987, was equivalent to the invocation of his right to remain silent, so his Fifth Amendment right to silence was violated. He also contends that his conversation with the officers that followed his request for the stop, in which he indicated his concern about his wife's hearing the details of what he had done to the victim, demonstrated police overreaching through subtle psychological persuasion. He argues that this, coupled with the officers' failure to comply with his request to stop, violated his Fifth Amendment right against self-incrimination.

The Court of Criminal Appeals affirmed the trial court's conclusion that Gribble's request to stop the tape recorder was not an unequivocal termination of the interview, or interrogation, but instead was a request to stop momentarily the recording of the confession, and thus, his Fifth Amendment right was not infringed. *See Gribble I*, slip op. at 13-14. The district court concluded that Gribble's claim concerning the police officers' overreaching and misleading tactics was procedurally barred and was without merit.

The circumstances giving rise to Gribble's taped confession are as follows: He was arrested in Tennessee on September 30, 1987, pursuant to a Harris County, Texas, warrant

---

[**] *See Mathiason*, 429 U.S. at 494-96; *see also United States v. Bengivenga*, 845 F.2d 593, 597 (5th Cir. 1988) (en banc) (holding that subjective intent of police is irrelevant to the determination whether defendant was in custody).

unrelated to the Jones investigation in Galveston County. Texas Ranger Joe Haralson and Wayne Kessler, an investigator with the Galveston County Sheriff's Office, traveled to Tennessee, interviewed Gribble, and accompanied him to Texas. On October 3, at the Harris County Sheriff's Office, Gribble again received *Miranda* warnings and orally confessed to the rape, kidnaping, and murder of Jones. He drew a map of where the body and Jones's purse could be recovered. He agreed to have his confession tape recorded.

The confession consisted of two tapes, the first lasting approximately one minute. After Haralson had identified each individual in the room during the taping and each person spoke his name, these comments followed:

Mr. Kessler: Tim, you also know that about 15 minutes ago at 9:15 we gave you rights before we talked the first time; is that correct.

Mr. Gribble: Yes.

Mr. Haralson: And I am fixing to again advise you of your rights.

Mr. Gribble: Could we stop this thing?

Mr. Haralson: WellSS

Mr. Kessler: What's the problem?

Mr. Haralson: We need the tape recorder on.

Mr. Kessler: Do you have a question?

Mr. Gribble: I don't feel comfortable. Even after telling you all this, I feel like shit. Like I said when I told youSSwhen youSSyou said that after I told you this that I would feel better. I don't feel better I feel worse. I feel like shit.

The confession recorded on the second tape began three minutes after the first recording. Those in the room again identified themselves, and Gribble again was advised of his rights.

Before relating the events surrounding Jones's murder, Gribble voiced his concern that his wife, Tammy, would hear the tape.

Kessler and Haralson informed Gribble that he would have a right to a trial; if he made "suitable arrangements with the State," it might not have to go to trial; they anticipated that he would be indicted; if there were a trial, the tape would be used as evidence at an open-court proceeding; and he could ask his wife not to be in the courtroom when the tape was played. After the tape recording ended, Gribble's wife arrived, and he spoke with her for approximately one-half hour.

A.

"The Supreme Court has held that if a suspect 'indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" *Barnes v. Johnson*, 160 F.3d 218, 224 (5th Cir. 1998) (quoting *Miranda*, 384 U.S. at 474-75), *cert. denied*, 119 S. Ct. 1768 (1999). Whether a statement is an ambiguous invocation of a constitutional right is determined by an objective inquiry as to how a reasonable police officer would have understood the defendant's comment. *Id.* at 224-25. What Gribble said to the officers about stopping the tape is a finding of fact viewed under the § 2254(d)(2) standard. The conclusion by the state appellate courtSSthat the statement was not an invocation of the right to remain silentSSis reviewed under the reasonable-application-of-federal-law standard of § 2254(d)(1).

The Court of Criminal Appeals stated Gribble's "stop" request as follows: "Can we stop for just a second." *Gribble I*, slip op. at 13. As noted above, Gribble requested, "Could we stop this thing." He asserts that Kessler's testimony at the first trial indicated that Gribble asked, "Can we stop the tape?" No matter what the precise phrase was, the ultimate fact found by the state appellate courtSSthat in the context of the situation, Gribble asked "for a momentary pause to recompose himself"SSis presumptively correct. *See id.* at 13; *Jackson*, 150 F.3d at 524; § 2254(e)(1).

**6**

At the first suppression hearing, Gribble testified that it was the concept of recording his confessionSSa recording his wife might hearSSthat precipitated his desire to stop the tape. He was willing to write his confession. Haralson testified at the second suppression hearing that Gribble was physically distressed when he asked for the tape to stop, that he choked but did not vomit, and that the second tape began once he had recomposed himself. In light of the circumstances surrounding Gribble's comment, the conclusion that the Fifth Amendment was not implicated by his request to stop is not an unreasonable application of federal law. *See Barnes*, 160 F.3d at 225; *Drinkard*, 97 F.3d at 767-68; § 2254(d)(1).

B.

As we have noted, the district court concluded that Gribble's issue concerning the manner in which the police conducted the October 3 taped interview/confession was procedurally barred. *See Gribble*, 8 F. Supp. 2d at 949-50. If a the district court does not address the merits of a particular § 2254 claim but denies relief because the claim is procedurally barred, the constitutional issue is never reached. In this situation, Gribble first must make a credible showing of error by the district court in its reliance on the procedural bar. *See Murphy v. Johnson*, 110 F.3d 10, 11 (5th Cir. 1997) (applying COA standard to nonconstitutional issue of exhaustion of state remedies). Only if he makes such a showing will the court consider whether his underlying claim satisfies the COA standard. *Id.* Although the district court alternately addressed the merits of the claim, *see Gribble*, 8 F. Supp. 2d at 950, we do not need to do so unless we determine that Gribble has made the initial showing of error under the standard enunciated in *Murphy*. *See Murphy*, 110 F.3d at 11.

Gribble did not raise on direct appeal or in his state habeas petition his argument of police overreaching. He asserted on direct appeal that the recorded confession should have been suppressed because the interviewing officers had violated state procedure by misleading him about the possible use of his confession: The confession might be used for or against him.[***] He argues that the claim presented on direct appeal was "functionally identical to the federal claim" presented in his habeas application.

"The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court." *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998) (footnote omitted). "A federal court claim must be the 'substantial equivalent' of one presented to the state courts if it is to satisfy the 'fairly presented' requirement." *Id.* (footnote omitted). The claim presented to the state appellate court arose from the state procedural rule prohibiting the use at trial of a confession if the defendant had been told by the interrogating officers that the confession could be used in his favor as well as against him. *See Gribble I*, slip op. at 8-9. This issue is a separate legal theory from the theory underlying the federal habeas claim, although the claims arise from the same operative facts. The federal claim was not fairly presented to the state court for satisfaction of the exhaustion requirement.[****]

Because Gribble failed to present his claim to the state courts, and presentation of the claim in state court would result in its dismissal as an abuse of the writ, the claim is procedurally barred in federal habeas court. *See Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995); *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995). Gribble does not assert an argument of cause and prejudice for this court to overlook his procedural default. He has not made a credible showing of error by the district court in applying the procedural bar

---

[***] *See Gribble*, No. 71-485, slip op. at 8-9; TEX. CODE CRIM. P. ANN. art. 38.22; *Creager v. State*, 952 S.W.2d 852, 854-55 (Tex. Crim. App. 1997) (holding that a warning renders confession inadmissible if it informs defendant that the confession can be used for or against him).

[****] *See Nobles*, 127 F.3d at 420 ("The exhaustion requirement is not satisfied if the prisoner presents new legal theories or factual claims in the federal habeas petition.").

to this habeas claim. *See Murphy*, 110 F.3d at 11.

## VI.

Gribble argues that the evidence obtained after he invoked his right to counsel should have been suppressed. Before accompanying the police to the physical location of Jones's body and purse, Gribble was taken before a state magistrate, who informed him of his right to counsel. When asked whether he desired to consult with counsel, Gribble answered in the affirmative, and the magistrate made the notation that Gribble wanted counsel to be appointed. Haralson then interjected that he believed Gribble had misunderstood the question. The magistrate continued to query Gribble, who said he wanted to maintain his cooperation with authorities before consulting with an attorney and subsequently led the officers to the location of the body. *See Gribble I*, slip op. at 5-6. Gribble's argument indicates that he views Haralson's interjection, occurring after Gribble essentially requested to speak with an attorney, as violative of the Fifth and Sixth Amendments.

The Court of Criminal Appeals concluded that Haralson's comment was not interrogatorial and that, even if it had been made as part of an interrogation, it was constitutionally permissible, because it assisted in clarifying Gribble's qualified invocation of his right to counsel. *See id.* at 7-8. After a suspect has been advised of his rights pursuant to *Miranda* and has invoked his right to speak with counsel, all interrogation must cease until he has conferred with counsel or until questioning can be done in the presence of counsel. *Michigan v. Jackson*, 475 U.S. 625, 636 (1986) (Sixth Amendment); *Edwards v. Arizona*, 451 U.S. 477, 484-87 (1981) (Fifth Amendment). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, . . . precedent[] do[es] not require the cessation of questioning." *Davis v. United States*, 512 U.S. 452, 459 (1994). "[T]he suspect must unambiguously request counsel." *Id.*

These prophylactic measures are implicated, however, only if the suspect is being questioned or interrogated by police. "'[I]nterrogation' under *Miranda* refers not only to express question, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted).

The record supports the state appellate court's assessment of the circumstances surrounding Haralson's comment and Gribble's request for counsel. That court found that Haralson's comment to the magistrate was "I believe that [Gribble] misunderstood your question." *Gribble I*, slip op. at 6. On the printed warning form, the magistrate indicated Gribble's affirmative response to the question "Do you wish to consult with your attorney?" and noted next to the printed question, "wishes to have atty appoint 12:22 AM 10/4."

The magistrate viewed Haralson's comment as directed to him, not Gribble. After Haralson's comment, the magistrate explained again to Gribble how counsel can be appointed, and Boyd told him that an attorney could be there in thirty minutes. Gribble then responded that he wanted counsel later, not immediately; he wished to do some act first.

Kessler viewed Haralson's comment as made to the magistrate, and he testified that Gribble's "puzzled look" precipitated Haralson's comment. Gribble's suppression-hearing testimony concerning the magistrate's recitation and advisement of rights did not include any mention by Gribble about Haralson's making a comment. Gribble testified that he indicated he wanted appointed counsel for consultation but did not want to wait thirty to forty minutes, because his wife was waiting.

Gribble does not challenge the magistrate's explanation and further inquiry concerning Gribble's request for appointed counsel. The

**8**

habeas claim focuses on Haralson's comment, which was not directed to Gribble and occurred as a neutral judicial officer was informing Gribble of his constitutional rights and was determining whether he understood those rights and wished to waive them. The state appellate court's determination that Haralson's comment was not interrogatorial for purposes of the Fifth Amendment, the Sixth Amendment, or *Miranda* is not contrary to clearly established federal law as determined by the Supreme Court. *See* § 2254(d)(1); *Innis*, 446 U.S. at 301-02.

## VII.

Gribble argues that the prosecution's challenge for cause of venireman Beverly Deaton should have been denied, because the prosecution's tactics in questioning Deaton about the standard of proof she would apply in determining the special questions during the punishment phase of the trial amounted to "prosecutorial browbeating." Although Gribble begins his argument by implying that Deaton should not have been excused for cause, he states his issue as follows:

[w]hether the prosecutor's relentless examination of this potential juror provided a basis from which [Gribble] could have developed an evidentiary challenge to the state trial court's determination, had he been given that opportunity, because the state court unreasonably accepted the fruits of prosecutorial browbeating as a genuine expression of her disqualification to serve.

This is not the claim raised by Gribble in his federal habeas application, in which he asserted that Deaton was qualified to serve on the jury and that granting the challenge for cause was erroneous. The district court denied this claim on the merits, concluding that the trial court's decision to exclude Deaton for cause was presumptively correct, and Gribble presented no evidence to rebut the presumption. *See Gribble*, 8 F. Supp. 2d at 952-53.

The requirement for a COA is jurisdictional, so if Gribble did not present to the district court a claim as to which he now requests a COA, we are without jurisdiction to consider it. *See Whitehead*, 157 F.3d at 388; *Muñiz*, 114 F.3d at 45. Accordingly, we cannot review Gribble's request for a COA on this issue. Moreover, a limited remand to the district court for consideration of a habeas claim raised for the first time in the COA motion would be contrary to the statutory prohibition against a successive habeas application's raising a claim that could have been raised earlier. *See* § 2244(b)(2).

## VIII.

Gribble argues that the evidence fails to prove beyond a reasonable doubt his intent to murder Jones or that the murder was done with deliberateness. He relies primarily on his taped confession concerning the immediate events preceding Jones's death, and he asserts that the evidence supports his versionSSthat the murder was unintentional and not done with deliberationSSas much as it supports the prosecution's version of what happened.

On direct appeal, Gribble argued that the evidence was insufficient to prove that he intentionally killed Jones. He asserted that his confession proved "that he accidently killed the victim in an attempt to silence her cries for help." *Gribble I*, slip op. at 1-2.

The Court of Criminal Appeals held that a rational juror could find the evidence sufficient to establish that Gribble intentionally killed Jones. *Id.* at 2. The state appellate court's assessment of the evidence focused on the manner in which Gribble carried out the kidnaping and murder of JonesSSincluding Gribble's hiding of the bodySSand on the medical examiner's testimony about strangulation taking several minutes before death occurs. That court's conclusion, under the federal standard of review of a sufficiency claim, is not an unreasonable application of federal law. *See Drinkard*, 97 F.3d at 769; § 2254(d)(1); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

As for Gribble's sufficiency argument concerning the evidence supporting the jury's

affirmative answer to one of the two special questions in determining punishment, Gribble notes that the district court viewed this portion of his habeas claim as being procedurally barred, because Gribble had failed to exhaust the claim in state court. *See Gribble*, 8 F. Supp. 2d at 955. To obtain a COA on this portion of his sufficiency claim, Gribble must make a credible showing of error. *See Murphy*, 110 F.3d at 11.

Gribble did not raise this sufficiency claim focusing on special issue 1 in his direct appeal or in the state habeas proceedings. He concedes the lack of exhaustion and contends that the issue is properly before the federal habeas court because he raised it in his first direct appeal, which resulted in retrial of the guilt and punishment phases. Gribble cites no authority for his novel interpretation of the fair-presentment requirement of the doctrine of exhaustion. He is not in custody pursuant to a judgment of conviction and sentence from his first trial. His assertion of exhaustion is legally frivolous.

Gribble also asserts that his lack of exhaustion should be excused because attempting to exhaust now would be futile. He cites *Layton v. Carson*, 479 F.2d 1275, 1276 (5th Cir. 1973), for the proposition that futility will excuse exhaustion. Supreme Court authority defeats this assertion.[*****]

Because any attempt to exhaust the claim in state court would result in the claim's dismissal as an abuse of the writ, the claim is procedurally barred. *See Fearance*, 56 F.3d at 642. Gribble fails to make a credible showing of error in the district court's determination concerning this portion of his sufficiency claim. *See Murphy*, 110 F.3d at 11.

IX.

---

[*****] *See Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) (holding claim procedurally barred from federal habeas review if "the petitioner would be required to present his claims in order to meet the exhaustion requirement [and] would now find the claims procedurally barred").

Gribble argues that by urging the jury to consider the question of future dangerousness in terms that included the possibility of his being out on the streets and in the community, the prosecution improperly commented, in closing argument during the penalty phase, on the possibility of parole or pardon. In arguing for the answer "no" to special issue 2 concerning Gribble's future dangerousness, his attorney asked the jury to consider whether there was any evidence to indicate that he would be raping or killing people in prison. During closing argument, the prosecutor made the following comments:

Second special issue, again probability he would commit continuing acts of violence and be a future threat to society, again very strong. And I think we proved those not beyond a reasonable doubt, but beyond any doubt. He did that when he went out and sexually assaulted Mary Kate O'Grady. When you answer that, I think you take in consideration conduct in the penitentiary but I think you also take in consideration conduct that the Defendant may have on the street in the community as a whole when you answer that special issue.

The defense objected to the comment as being "clearly outside of what's going on. If he gets a life sentence that's obviouslySSthat's improper argument." The court overruled the objection, noting that "[t]he issue is whether or not he will be a continuing threat to society."

During deliberations, the jury asked the following question: "As per Mr. Abbington's statement of 'life in prison' does that mean he will spend the rest of his normal natural life in prison or does that equate into years." The court answered by referring to the following paragraph in the general charge:

With regard to the effect of your answers to the Special Issues in this case you are not to discuss or consider any possible actions of the Governor or the Pardons and Paroles Division of the

**10**

Texas Department of Criminal Justice. During your deliberations in this case, you must not consider, discuss, or relate any matters not in evidence before you. You should not consider or mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.

Gribble contends that the Eighth Amendment was violated by the comment, because the sentence was arbitrarily imposed: The prosecutor placed before the jury that life in prison could be less than Gribble's natural life. He also contends that the comment amounted to a Fourteenth Amendment violation, because it made his death sentence fundamentally unfair: The jury impermissibly considered the possibility of parole if a life sentence was imposed.

The Court of Criminal Appeals held that the prosecutor's comment was not improper, because "[t]he possibilities of escape or some other release from prison are legitimate concerns in determining the future dangerousness of a defendant." *Gribble I*, slip op. at 14. Although the state asserted that the constitutional claims based on the prosecutor's comment were not raised on direct or state habeas review and thus were procedurally barred, the district court gave Gribble the benefit of the doubt that the constitutional claim had been sufficiently raised on direct appeal and thus had been exhausted. The court addressed the merits. *See Gribble*, 8 F. Supp. 2d at 954-55.

Gribble relies on *Simmons v. South Carolina*, 512 U.S. 154, 169 (1994), and *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985) (reasoning that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere"), for his due process and Eighth Amendment arguments. *Simmons* is inapplicable, because Texas does not provide the jury the option to impose a sentence of life without parole. *See*

*Green v. Johnson*, 160 F.3d 1029, 1045 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 1107 (1999).

Under Texas law, the jury may not consider parole or parole eligibility. *See Colburn v. State*, 966 S.W.2d 511, 519 (Tex. Crim. App. 1998). The prosecutor did not use the word "parole," and Gribble's speculation that the comment was an indirect challenge to defense counsel's argument, which incorrectly presumed that Gribble would be in prison for his natural life if given a life sentence, is baseless. The jury showed, by its question, that its possible consideration of parole was a result of the comment of defense counsel, not the prosecutor. The court answered the question by directing the jury to the general instruction to disregard consideration of parole or pardon in the deliberations.

The record does not support Gribble's contention that the prosecutor's comments misled the jury as to its role in determining sentence or as to the proper boundaries of future dangerousness. *See Sawyer v. Butler*, 881 F.2d 1273, 1285 (5th Cir. 1989) (en banc), *aff'd sub nom. Sawyer v. Smith*, 497 U.S. 227 (1990). The Constitution does not prohibit a jury's consideration of the actual length of a life sentence. *See Simmons*, 512 U.S. at 163. The state appellate court concluded that the prosecutor's comment was not improper under state law. *See Gribble I*, slip op. at 14. The state court's conclusion is not "contrary to . . . clearly established Federal law, as determined by the Supreme Court." § 2254(d)(1).

X.

Gribble argues that the nullification charge, given in response to the *Penry* error[******] from

---

[******] *Penry* requires the jury to receive, in addition to the instructions on the art. 37.071 special issues, special instructions about mitigation evidence if the defendant introduces evidence reflecting reduced culpability and the jury cannot give mitigating force to the evidence under the art. 37.071 special issues. *See Penry*, 492 U.S. at 318-

the first trial, was confusing and cumbersome and insufficient to make the sentence a reasoned consideration, as required by the Constitution, of all the mitigating evidence. The general charge included the following:

> When you deliberate about the questions posed in the Special Issues, you are to consider any mitigating circumstances supported by the evidence presented in both phases of the trial. Mitigating circumstances may include, but are not limited to, any aspects of the defendant's background, character, record, or circumstances of the crime which you believe makes a sentence of death inappropriate in this case. If you find there are any mitigating circumstances you must decide how much weight they deserve, if any; and give them the consideration and effect they deserve, if any, when you answer the Special Issues.

> If you determine, in consideration of this mitigating evidence, that a life sentence rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, you are instructed to answer at least one of the Special Issues under consideration "no." If you have made such a determination, an answer of "no" should be given independently of whether such mitigating evidence is relevant to either Special Issue, and regardless of what you find the answers to the Special Issues to be.

Gribble challenges the constitutionality of the second paragraph, which he refers to as the "nullification charge."

Gribble failed to challenge the nullification charge on direct appeal, and it was not raised in his state habeas petition. He listed the following contention in his *pro se* motion to strike the state habeas petition: "The trial

---

(...continued)
court committed reversal [sic] error by refusing to instruct the jury on mitigating evidence of [Gribble]'s background of childhood abuse." The Court of Criminal Appeals assumed, without deciding, that the *pro se* claims could be treated as supplemental habeas claims and denied relief because the claims were conclusional.

The state asserted in the district court that Gribble's nullification charge claim was unexhausted and could not then be exhausted, and thus the claim was procedurally barred from federal habeas review. The court noted the state's assertion of the procedural bar but exercised its discretion under § 2254(b)(2) and reviewed the merits. *See Gribble*, 8 F. Supp. 2d at 957.

The court concluded that to grant relief on Gribble's nullification charge claim, it would have to announce a new rule of constitutional law, which is prohibited by *Teague v. Lane*, 489 U.S. 288, 305-08 (1989). *See Gribble*, 8 F. Supp. 2d at 957. Gribble argues that *Teague* is inapplicable, because his habeas claim is based on *Penry*, 492 U.S. at 318-19, and *Roberts v. Louisiana*, 428 U.S. 325, 334-35 (1976).

"Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague*, 489 U.S. at 310. The exceptions are "if the new rule (1) puts certain kinds of primary, private individual conduct beyond the power of the criminal law-making to proscribe or (2) is a rule of procedure that is implicit in the concept of ordered liberty . . . . The second exception is reserved for watershed rules of criminal procedure." *Muñiz v. Johnson*, 132 F.3d 214, 225 (5th Cir. 1998) (internal quotations and citations omitted).

*Roberts* was one of five opinions issued by the Court on the same day. The Court essentially applied the *Gregg v. Georgia*, 428 U.S. 153, 195 (1976), rationale to the Louisiana death penalty statute, which directed the use of a responsive-verdict procedure, and

held the statute to be violative of the Eighth Amendment, because it failed to channel the jury's judgment or provide an adequate check on the possible arbitrary imposition of the death penalty. *See Graham v. Collins*, 950 F.2d 1009, 1018 (5th Cir. 1992) (en banc), *aff'd*, 506 U.S. 461 (1993). The Court has upheld the Texas death penalty sentencing scheme, *see Graham v. Collins*, 506 U.S. 461, 474 (1993); *Jurek v. Texas*, 428 U.S. 262, 268-75 (1976), and, as we have noted, *Penry* requires that the mitigating evidence not be beyond the effective reach of the jury, *see Robinson v. Johnson*, 151 F.3d 256, 263 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 1578 (1999).

Gribble does not contend that any specific mitigating evidence was beyond the jury's reach. A review of the charge confirms that the jury could consider mitigating evidence, if any, in its consideration of the special issues and beyond the scope of those issues. Thus, to grant relief on Gribble's nullification charge claim, we would need to apply a new rule of constitutional law, because Gribble seeks relief beyond the purview of *Jurek*, *Penry*, and *Graham*. *See Graham*, 506 U.S. at 475-77. Gribble's claim is barred by *Teague*. *See Lucas v. Johnson*, 132 F.3d 1069, 1083 (5th Cir.), *petition for cert. dismissed*, 141 L. Ed. 2d 765 (1998).

## XI.

Gribble argues that the district court erred in ordering him to refrain from filing a response to the state's summary judgment motion and by denying his motion for a FED. R. CIV. P. 16 conference, which he asserts would have provided the opportunity to address the merits of his habeas claims. He asserts that the truncation of the rule 56 procedures impermissibly impaired his right to habeas counsel, pursuant to 21 U.S.C. § 848(q)(B), to research and present the habeas claims.

Gribble's appeal is before us on motion for COA. His contentions concerning procedural irregularities, if any, in the district court are non-constitutional in nature. *See* § 2253(c)(2) (stating that a COA issues if "applicant has made a substantial showing of the denial of a constitutional right"). Thus, for a COA to issue, Gribble first must show error in the granting of summary judgment. *See Murphy*, 110 F.3d at 11.

To show harm, Gribble contends that evidence from the first trial would have shown a different factual context of the taped confession. He does not specify the precise factual context, but we presume he is referring to the different phrases in the record as to the precise wording he used in asking that the recording of his confession be stopped or paused.

Gribble avers that the lack of an opportunity to respond to the state's amended summary judgment motion/answer denied him the opportunity to assert that presentation of issues on the initial direct appeal was sufficient exhaustion to overcome the state's assertion of the lack of exhaustion and of procedural bar on some of his claims. As we have noted, Gribble cites no authority to support his novel interpretation of the fair-presentment requirement.

Gribble complains that the truncated procedures impaired his right to have counsel present the habeas claims to the district court with factual specificity and citation to authority. A review of the state's amended summary judgment/answer and of the district court's memorandum opinion reveals that Gribble's habeas application was sufficient for consideration of the habeas claims. *See Gribble*, 8 F. Supp. 2d at 945-57. Any error in the procedures surrounding the grant of summary judgment was harmless.[*******]

Even assuming Gribble has made a credible showing of error, thus satisfying the first of the two-part *Murphy* standard for a COA, the

---

[*******] *See Resolution Trust Corp. v. Sharif-Munir-Davidson Dev. Corp.*, 992 F.2d 1398, 1403 (5th Cir. 1993) (concluding that summary judgment without sufficient notice to the nonmoving party was harmless); FED. R. CIV. P. 61.

second part of the standard is the § 2253(c)(2) standardSSmaking a substantial showing of the denial of a constitutional right. *See Murphy*, 110 F.3d at 11. As we have stated, Gribble fails to meet the standard warranting the issuance of a COA on any of his habeas claims. *See* § 2253(c)(2). Thus, he is not entitled to a COA on his claim concerning procedural error in the district court.

The application for a COA is DENIED.